## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUGUSTUS ENERGY RESOURCES, LLC, [1] | ) | Case No. 18-10580 |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF STEVEN D. DURRETT, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF AUGUSTUS ENERGY RESOURCES, LLC IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Steven D. Durrett, hereby declare under penalty of perjury:

1.  I am the President and Chief Executive Officer ("CEO") of Augustus Energy Resources, LLC ("Augustus Resources" or the "Debtor"), a Delaware limited liability company and the Debtor and debtor in possession in the above captioned chapter 11 case.

2.  I have served as President and CEO of Augustus Resources since November 21, 2013. I am personally familiar with the Debtor's day-to-day operations, business, financial affairs, books and records.

3.  I submit this Declaration (the "Declaration") to aid the Court and parties in interest in understanding the circumstances that led to the filing of this chapter 11 case and in support of (a) the Debtor's petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on March 7, 2018 (the "Petition Date"), and (b) the emergency relief that the Debtor has requested from the Court pursuant to the various motions and applications filed today and described herein (the "First Day Motions").

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Augustus Energy Resources, LLC (6220). The location of the Debtor's corporate headquarters is: 2016 Grand Avenue, Billings, MT 59102.

4.      Unless otherwise indicated, the facts set forth herein are based upon my personal knowledge, my discussions with my management team, my review of relevant documents and information concerning the Debtor's operation, financial affairs, and/or my opinions based on my knowledge and experience.  If called as a witness, I could and would testify competently to the facts contained in this Declaration.

## First Day Motions

5.      Debtor has requested a variety of relief in its First Day Motions intended to stabilize the Debtor's business operations and facilitate the efficient sale of the Debtor's Assets (as such term is defined below).  The First Day Motions include:

- *Motion for Interim and Final Orders (i) Authorizing the Debtor to Use Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 507, and 552, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b), and (v) Granting Related Relief* (the "Cash Collateral Motion");

- *Motion for Entry of Interim and Final Orders (i) Authorizing Mineral Payments and Working Interest Disbursements and (ii) Granting Related Relief* (the "Mineral Payments Motion");

- *Motion for Entry of Interim and Final Orders (i) Authorizing the Payment of (a) Lease Operating Expenses, (b) Fuel Expenses, (c) Joint Interest Billings, (d) Gathering Expenses, and (e) 503(b)(9) Claims, (ii) Confirming Administrative Expense Priority of Outstanding Orders, and (iii) Granting Related Relief* (the "Lease Operating Expenses Motion");

- *Motion for Entry of Interim and Final Orders: (i) Authorizing Maintenance of Existing Bank Account and Continued Use of Cash Management System and Procedures; (ii) Waiving the Requirement of 11 U.S.C. § 345 (iii) Granting Administrative Expense Status to Post-Petition Amounts Owed Under the Master Services Agreement; and (iv) Granting Related Relief* (the "Cash Management Motion");

- *Motion for Entry of an Interim Order and a Final Order (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Service, (ii) Deeming Utility Providers Adequately Assured of Payment, and (iii) Establishing Procedures for Resolving Requests for Adequate Assurance of Payment* (the "Utilities Motion"); and

- *Application of Debtor Pursuant to 28 U.S.C. § 156(c) and Del. Bankr. L.R. 2002-1(f) for Authorization to Retain and Appoint JND Corporate Restructuring as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* (the "<u>Claims Agent Application</u>").

6.      I have reviewed and am familiar with the contents of each First Day Motion and the facts stated therein are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each of the First Day Motions is necessary to preserve the value of Debtor's Assets as an operative business and give Debtor an opportunity to work toward a successful chapter 11 case that will benefit all of the Debtors' stakeholders. I respectfully submit that, for the reasons discussed herein, each of the First Day Motions should be approved.

7.      Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm." Given this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Other relief will be deferred for consideration at a later hearing.

### **General Background**

8.      Augustus Resources is a privately owned, natural gas exploration, development and production company headquartered in Billings, Montana. The Debtor owns operating and non-operating working interests in approximately 1,575 natural gas wells in the eastern portion of the DJ Basin in eastern Colorado, primarily in Yuma County, as well as certain personal property, including buildings, equipment, transportation equipment, machinery, gathering systems, compressors, and a pipeline system (together, the "<u>Debtor's Assets</u>").

9.      The Debtor is a Delaware limited liability company formed in 2013 to own and operate the Debtor's Assets and to pursue other natural gas opportunities.  As explained in more detail below, Augustus Energy Partners II, LLC ("Augustus Partners II") provides back office and management services to Debtor for which it receives a monthly management fee pursuant to the Management Services Agreement (as amended, "MSA") between the Debtor and Augustus Partners II.

10.      A predecessor to the Debtor, Augustus Energy Partners, LLC ("AEP"), which was formed in 2006, acquired what is now the Debtor's Assets in separate transactions from Berry Petroleum Company and Rosetta Resources, Inc. in 2009 and 2011, respectively.  In 2013, AEP was owned as follows:

| | |
|---|---|
| Lime Rock – Augustus Holdings, L.P. | 47.573% |
| Kayne Anderson Energy Fund III QP, LP | 46.296% |
| Kayne Anderson Energy Fund III, LP | 1.277% |
| Others | 4.854% |
| | 100.00% |

11.      In December 2013, AEP split into two separate entities – the Debtor (Augustus Resources) and Augustus Partners II.  The Debtor is now owned as follows:

Augustus Resources

| | |
|---|---|
| Kayne Anderson Natural Gas Fund, L.P. | 96.684% |
| Others | 3.316% |
| | 100.000% |

Augustus Partners II is owned as follows:

Augustus Partners II

| | |
|---|---|
| Lime Rock – Augustus Holdings II, L.P. | 82.639% |
| Wells Fargo Central Pacific Holdings, Inc. | 15.495% |
| Others | 1.866% |
| | 100.000% |

12.    At the time of the December 2013 transaction, the Debtor purchased the Debtor's Assets from AEP for approximately $104,000,000, of which $73.6 million was paid in cash and the remaining $31 million was assumed debt from a prior existing secured credit facility.[2]  The purchase price was determined after an extensive marketing process run by Petrie Partners, a firm specializing in marketing oil and gas assets.  The Debtor financed the acquisition with approximately $56 million in equity and $54 million in senior secured debt (the "Senior Secured Credit Facility") pursuant to that certain *Credit Agreement* dated as of December 3, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Debtor, as borrower, and Wells Fargo Bank, National Association, as administrative agent, a letter-of-credit issuer, swap provider, and lender (the "Pre-Petition Lender"), along with other instruments, agreement, or documents executed in connection therewith (collectively, the "Pre-Petition Claim Documents").  To close the acquisition, the Debtor drew down approximately $54 million of the Senior Secured Credit Facility, which was and is secured by substantially all of the Debtor's Assets (collectively, the "Pre-Petition Collateral").  The Senior Secured Credit Facility has an initial borrowing base of $75 million and a maximum credit amount of $200 million.

13.    The sale of AEP's assets to the Debtor in December 2013, was an arms-length transaction and, as noted, the Debtor was capitalized with approximately $54 million in equity. Having sold substantially all its assets to the Debtor, AEP was subsequently dissolved.  Augustus Partners II was created as part of the December 2013 transaction for the purpose of exploration, development and production of oil and gas throughout North America and was capitalized by the

---

2 Debtor also purchased AEP's hedge position in various ISDA agreements for approximately $10 million

other large equity holder in AEP.  In addition, Augustus Partners II became the field service and back office provider for the operation of the Debtor's Assets.

14.     At the time of the December 2013 sale of AEP's assets to the Debtor, Augustus Partners II and the Debtor concurrently entered into a Management Services Agreement.  The MSA's terms were negotiated and approved by a majority of the respective boards of Debtor and Augustus Partners II.  Pursuant to the MSA (as subsequently amended), Augustus Partners II employees run Debtor's operations and manage all accounting and back office matters for a current monthly management fee of $100,000, plus pass through payments of identified reimbursable expenses such as wages for field employees and other pass-through vendor and operational expenses. The Debtor itself does not have any employees and relies on the services provided by Augustus Partners II for the operation of the Debtor's Assets.

15.     I have been involved with the development of the Debtor's Assets since the initial Berry Petroleum Company and Rosetta Resources, Inc. acquisitions by AEP and the subsequent December 2013 transaction in which the Debtor acquired its properties from AEP and entered into the MSA with Augustus Partners II.  I currently serve as president of both the Debtor and Augustus Partners II and own small equity interests in both entities.  I am a board member of Debtor, but am not a board member of Augustus Partners II.[3]

16.     The Debtor's gas properties encompass approximately 148,000 gross acres (102,000 net) in the eastern DJ Basin in Yuma County, Colorado. Approximately 80% of the Debtor's acreage is held by production.  The 1,575 wells in which the Debtor owns interests draw from shallower zones (1,800' to 3,000' depth) in the Niobrara formation and include long-lived reserves, with consistent production and slow rates of decline. Recent net production was

---

[3] I own a 1.351% membership interest in the Debtor and a 0.682% membership interest in Augustus Partners II.

approximately 12.0 MMcf/d.[4]  The Debtor continues to control a significant leasehold position in northeastern Colorado; however, due to the decline in natural gas prices and AER's financial condition, AER has ceased drilling new gas wells.

17.     In addition, the Debtor also owns 400 miles of low pressure gathering lines, compression sites and equipment, and 175 miles of high pressure discharge lines through which it markets 14.1 MMcf/d.  This system is known as the Yuma Gathering System. The services for the operation of the gathering, compression, and pipeline systems are performed by Augustus Partners II on behalf of the Debtor pursuant to the MSA.  For the year ending December 31, 2017, the Debtor generated approximately $11.0 million in upstream gas revenue compared to $27.6 million for the 13 months ending December 31, 2014. This nearly 60% reduction in generated revenue reflects the collapse in the price of natural gas and decline in production between 2014 and today and its impact on the Debtor's operations.

18.     At the time of the closing of the December 2013 acquisition, the Debtor had excess cash on hand and used it along with operating cash flow to pay down the outstanding loan balance from $54 million to $50.5 million in January 2014. Thereafter, the Debtor made regular monthly payments totaling $22.5 million under the Senior Secured Credit Facility. At the same time, the market price of natural gas underwent a steady decline with the result that by the beginning of 2017, the Debtor's borrowing base, which was subject to a twice annual redetermination pursuant to the Senior Secured Credit Facility, had declined to $21 million as of June 2017.

19.     Notwithstanding the substantial monthly payments from the Debtor, the outstanding principal balance due under the Senior Secured Credit Facility in July 2017 was $28

---

[4] "MMcf" is a unit of measurement equaling one million cubic feet, a common measure of gas volume in the gas industry.

million and the Debtor was in default. The commodity price decline curtailed additional drilling to increase production and, as a result, the Debtor found itself unable to meet debt covenants notwithstanding significant efforts to reduce operational expenditures.

20.      These macroeconomic factors, coupled with the Debtor's substantial debt obligations and operational costs with respect to its 1,575 wells, strained the Debtor's ability to sustain the weight of its capital structure and devote the capital necessary to maintain and grow its businesses.

21.      Like many gas companies across the country, the Debtor considered various proactive steps to stabilize its financial position, including minimizing capital expenditures and not pursuing any new drilling projects, and, to the extent possible, reducing operational expenditures. In April 2016, the Debtor and Augustus Partners II amended the MSA and reduced the monthly management fee payable to Augustus Partners II by 30% and deleted any cost of living adjustment even though there were no changes in the management responsibilities required to own and operate the Debtor's wells and gathering and pipeline systems.

22.      Notwithstanding the Debtor's efforts to pay-down the amounts due Wells Fargo under the Senior Secured Credit Facility from monthly cash flow and to otherwise reduce expenses of the company, such actions did not enable the Debtor to keep ahead of the borrowing base redeterminations resulting from the collapse in the price of natural gas.

23.      Given certain covenant defaults under its Senior Secured Credit Facility and an inability to make the required payments to cure a borrowing base deficiency, the Debtor, with the consent of its secured lender, retained TenOaks Energy Advisors, LLC ("TenOaks") on August 28, 2017, to assist the Debtor in marketing its gas properties and associated gathering, compression, and pipeline systems.   TenOaks has substantial expertise in energy focused

acquisition and divestiture transactions and has a wide marketing network with contacts throughout North America for prospective buyers.

24.     TenOaks pursued a comprehensive process to market the Debtor's Properties, going to market with a preliminary information memorandum that it prepared and widely circulated to approximately 8,000 individual contacts. From that effort, I understand that TenOaks received 24 executed non-disclosure agreements which allowed interested parties to obtain access to the electronic data room established and maintained by TenOaks, which contained detailed information on all aspects of the Debtor's Properties and business. Ultimately, this process, which was conducted over a 6-week period, resulted in two written and one oral offer to acquire the Debtor's Properties. All the bids received in the process were substantially below the balance due Wells Fargo under the Senior Secured Credit Facility. Throughout the process, the Debtor was in frequent communication with Wells Fargo and was able to, with Wells Fargo's consent, remain current with respect to amounts due operational vendors, creditors, and Mineral Payments due Working Interest Owners.

25.     In 2015, royalty owners sued the Debtor in the United States District Court for the District of Colorado, Case No. 15-cv-00835-KLM, captioned *Melissa Clarke Crichton v. Augustus Energy Resources, LLC* ("Royalty Lawsuit"). Plaintiffs in the Royalty Lawsuit claim that the Debtor improperly charged royalty owners certain post-production processing and transportation costs. The Debtor disputes the Plaintiffs' claim that it improperly calculated royalty payments due. On March 31, 2017, the Court granted Plaintiffs' motion to certify the case as a class action to include in the class, with a few exceptions, all royalty and overriding royalty owners from whom (beginning in December 2009) the Debtor or its predecessors took post-production deductions unless the operative oil and gas lease expressly permits those

deductions. After class certification was granted, this case was set for a trial to commence on August 6, 2018. Plaintiffs' expert report in support of their motion for class certification, dated March 17, 2016, indicates that Plaintiffs seek $3.7 million in damages from the Debtor, which included prejudgment interest at 8% per annum as of that date.

26.    The Royalty Lawsuit has caused concern amount prospective purchasers of the Debtor's Assets. This risk, as communicated to the Debtor by each of the prospective purchasers, has led the Debtor to conclude that the best way to maximize value and to effectuate a timely sale of the Debtor's Properties is through the chapter 11 process and to pursue an auction centered around a stalking horse sale structure.

27.    The Debtor and prospective purchasers engaged in significant negotiations for the sale of the Debtor's Properties as a result of the TenOaks process. The Debtor and OWN Resources, Inc. (the "Stalking Horse Purchaser"), as a result of that process, have entered into an Asset Purchase Agreement dated as of March 15, 2018, for the purchase of the Debtor's Properties (the "Purchase Agreement").

28.    The Debtor intends to file a *Motion for Entry of (I) An Order (a) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially of the Debtor's Assets, (b) Approving the Form and Manner of Notice Thereof, (c) Scheduling an Auction and Sale Hearing, (d) Approving Procedures for the Assumption and Assignment of Contracts, and (e) Granting Related Relief and (II) An Order (a) Approving the Asset Purchase Agreement Between the Debtor and the Purchasers, (b) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (c) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "Bidding Procedures and Sale Motion").

## Cash Collateral Motion

29.     By the Cash Collateral Motion, Debtor seeks authorization to use the Cash Collateral of Wells Fargo, to provide adequate protection, to modify the automatic stay, and to obtain related relief.

30.     As noted previously, at the time of the Debtor's acquisition of the Debtor's Properties from AEP in December 2013, the Debtor entered into the Senior Secured Credit Facility to finance part of the acquisition price. The Senior Secured Credit Facility provided the Debtor with a revolving credit facility subject to a borrowing base as may be adjusted by Wells Fargo based upon the value of the Debtor's gas reserves and gathering system.

31.     The Senior Secured Credit Facility is secured by, among other things, a first-priority Amended and Restated Mortgage, Security Agreement, Assignment of Production and Proceeds, Financing Statement and Fixture Filing (Yuma County, Colorado), as recorded in the real property records in Yuma County, Colorado, and a UCC-1 Financing Statement as filed with the Secretary of State of Delaware. It is my understanding that, pursuant to the Senior Secured Credit Facility, Wells Fargo has an interest in the Debtor's cash collateral as defined under the Bankruptcy Code.

32.     The Debtor and Wells Fargo have engaged in good-faith, arms' length negotiation over the proposed terms of the Debtor's use of cash collateral during this chapter 11 case. In connection with the Debtor's efforts to sell substantially all its assets through the Bidding Procedures and Sale Motion, the Debtor agreed to seek entry of an interim order and a final order permitting its use of cash collateral.   The Debtor's access to cash collateral is critical to effectuate the proposed sale and maximize value for the creditors in the chapter 11. Without

access to cash collateral, the Debtor would be incapable of operating its business and the estate (and all stakeholders) would be immediately and irreparably harmed.

33.     As discussed in greater detail in the Cash Collateral Motion, as part of the consensual arrangement and as adequate protection for any diminution in value during this case, the Debtor has agreed to provide Wells Fargo with replacement liens and superpriority administrative claims, maintain the Debtor's existing cash management systems, and comply with certain budget and reporting requirements.

34.     A significant portion of the collateral includes natural gas properties and related assets (including real property and personal property related thereto) on which Wells Fargo has liens, including the natural gas extracted by the Debtor from those properties and the proceeds generated from sales thereof.  The Debtor's business is to produce the natural gas from its properties, gather and transport such gas, along with the gas from certain other producers, to market. Thus, the orderly continuation of the Debtor's operations and the preservation of its going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.

35.     The Debtor uses cash on hand and cash flow from operations to fund its working capital needs, capital expenditures, and for other general corporate purposes.  An inability to use these funds during the chapter 11 Case could cripple the Debtor's business operations.  Indeed, without access to Cash Collateral the Debtor and its estate would suffer immediate and irreparable harm.

36.     The path forward for the Debtor is clear and time is of the essence.  As of the Petition Date, the Debtor has approximately $2 million (net of all outstanding checks) in cash on hand, all of which constitutes Cash Collateral.  If the Debtor is unable to use Cash Collateral, the

Debtor will not have sufficient working capital to: (i) make payments to mineral interest holders, which regular and continued payments allow Debtor to hold its interest in certain oil and gas leases and maintain its status as contract operator of certain gas wells; (ii) make payments to vendors or suppliers, (iii) satisfy ordinary operating costs; or (iv) fund the administrative costs of the chapter 11 Case.  Without access to Cash Collateral, the Debtor's ability to sell its assets and maximize value for the creditors will be jeopardized.  In such a scenario, the value available for distribution to stakeholders in the chapter 11 Case would be significantly reduced.  Indeed, access to Cash Collateral is essential.

37.    The Debtor, with the assistance of its advisors, has formulated a 13-week cash flow budget, in form and substance satisfactory to Wells Fargo, for the use of Cash Collateral during the interim period (the "Initial Budget").  The Debtor believes that the Initial Budget will provide the Debtor with adequate liquidity during the interim period.  The Initial Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Initial Budget is prepared.  The Debtor believes that the Initial Budget includes all reasonable, necessary and foreseeable expenses to be incurred in connection with the operation of its business for the period set forth in the Initial Budget.

**Mineral Payments Motion**

38.    By the Mineral Payments Motion, Debtor seeks authority to remit or apply prepetition payments owed Royalty and Working Interest Owners in the Debtor's ordinary course of business to continue remitting such payments in the ordinary course of business on a postpetition basis.

39.    The Debtor operates both as an upstream exploration and production ("E&P") company and as a midstream gathering and transporting company.  As an E&P company, the

Debtor has entered into oil and gas leases with the owners of the mineral interests. The mineral interests generally consist of a real property interest in the minerals in place under a parcel of property and the exclusive right to explore, drill, and produce the minerals from the land. Through an oil and gas lease, owners of mineral interests sell or otherwise convey the exclusive right to capture minerals (a "Working Interest") to a third party (a "Working Interest Owner") in exchange for either a share of production or payments in lieu of a share of production (a "Royalty Interest").

40.     A Working Interest may be subject to or burdened by various other interests in minerals, production, or profits, which may have been created before or after the oil and gas lease was entered into or which may exist in the absence of an oil and gas lease.  Such interests can take many forms, including overriding royalty interests, non-participating royalty interests, net profits interests, production payments and unleased mineral interests (collectively, with Royalty Interests, the "Interest Burdens").  When a Working Interest is subject to Interest Burdens, the Working Interest Owner is required to make payments, in cash or "in kind" (i.e., in the form of oil or gas) (collectively, the "Mineral Payments"), to the interest owners underlying the Interest Burdens (collectively, the "Mineral Payees").

*Mineral Payments*

41.     Mineral Payments typically are not uniform and are not precisely predictable on a month-to-month basis. In the twelve months ending February 28, 2018, the Debtor remitted approximately $1.9 million in Mineral Payments.  Though the monthly number of Mineral Payments is subject to variation due to many factors, such as the specific terms of underlying agreements, changes in ownership, and changes in the amount of gas captured, the Debtor makes approximately 500 to 900 Mineral Payments per month by check (or, in the case of the federal

government, by wire transfer). These payments generally are remitted by the Debtor to Mineral Payees at or around the 15th of each month and, because of the time required to market and sell gas as well as conduct a proper accounting, the Debtor historically makes Mineral Payments 45 days in arrears. For example, Mineral Payments for gas produced in January 2018 will become due on approximately March 15.

42.      The Debtor owns Working Interests in approximately 1,575 gas wells in Colorado and is a party to well over 1,000 oil and gas leases with Mineral Payees. Failure to make Mineral Payments would have a material adverse effect on the Debtor and Debtor's Assets. Although the terms of such oil and gas leases vary, Mineral Payments are governed by the terms of the oil and gas leases that set strict payment deadlines. If Debtor does not continue to timely remit Mineral Payments to the Mineral Payees, there is a substantial risk that the Mineral Payees may argue, under the terms of their respective leases, that such non-payment allows them to terminate certain rights granted under the leases, such as access rights or future rights to renew the leases or, in some cases, to promptly terminate the lease entirely. Failure to timely make Mineral Payments may also subject Debtor to statutory penalties imposed by Colorado oil and gas regulators. Debtor's oil and gas leases are its most significant and valuable asset, which value and marketability would be greatly and irreparably diminished if the leases were at risk of modification or termination due to Debtor's nonpayment of Mineral Payments. Indeed, potential purchasers of Debtor's Assets could decline to bid on such assets if the Debtor's oil and gas leases are at risk for modification or termination.

*Working Interest Disbursements*

43.      The efficient capture of minerals often requires access to an area of land or depths (the "Contract Area") in which the right to develop the minerals is owned by more than one

Working Interest Owner. Accordingly, the rights and responsibilities associated with the capture of minerals are allocated by and between the Working Interest Owners either by mutual agreement or by the application of well-established real property and contractual precedents.

44.     Working Interest Owners commonly enter into a joint operating agreement (a "JOA") to memorialize the terms under which the parties will allocate the revenues and costs from the applicable Contract Area. The JOA will designate one Working Interest Owner as the operator of the Contract Area (the "Operator"), with the other Working Interest Owners holding non-operating interests ("Non-Op Working Interests"). The Operator conducts the day-to-day business associated with capturing minerals in the Contract Area on behalf of the other Working Interest Owners (the "Non-Op Working Interest Owners").  The Operator generally will pay all of the expenses associated with such operations (the "Lease Operating Expenses") on account of its Working Interest and the Non-Op Working Interests. It subsequently will bill the holders of Non-Op Working Interests for their pro rata share of Working Interest Expenses (each, a "Joint Interest Billing" or "JIB").

45.     Non-Op Working Interest Owners will sometimes take their share of gas produced in the Contract Area in kind.  In some instances, however, the Operator markets and sells the gas produced in the Contract Area on behalf of the Non-Op Working Interest Owners and disburses the proceeds of such sales to the Non-Op Working Interest Owners in accordance with the JOA (generally, the "Working Interest Disbursements"). In the ordinary course of business, the Operator may set off Working Interest Disbursements owed to certain Working Interest Owners against the pro rata portion of JIBs owed by such owners.

46.     Of the Working Interests Debtor owns in approximately 1,575 gas wells in Colorado, Debtor is the Operator for approximately 975 of those wells. Debtor, as Operator,

receives the majority of proceeds from the previous month's production on the 25th day of the month following production and generates checks or wires on account of Working Interest Disbursements the following month. For example, Working Interest Disbursement for gas produced in January would traditionally be paid on the 15th of this month.

47.    Failure to pay Working Interest Disbursements to Non-Op Working Interest Owners could result in a material adverse effect on the Debtor and its Working Interests, such as giving rise to the right to remove Debtor as Operator, the right to suspend rights in the Contract Area, and the right to interest on amounts owed.

### Lease Operating Expenses Motion

48.    By the Lease Operating Expenses Motion, Debtor seeks authority to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of: (i) lease operating expenses, (ii) fuel expenses, (iii) joint interest billings, (iv) gathering expenses, and (v) 503(b)(9), as well as a confirmation of the  administrative expense priority status and allowed administrative treatment of Debtor's undisputed obligations for the postpetition delivery and performance of goods and services and authorization payment of such obligations in the ordinary course of business.

### *Lease Operating Expenses*

49.    Lease Operating Expenses commonly include payments to third parties that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintaining of an oil and gas property. As described herein, applicable state law may permit such third parties (each, a "Lien Claimant") to assert liens against Debtor's property, including Debtor's Working Interests, the oil and gas produced, or the proceeds from the sale of such oil and gas production.

50.     Lease Operating Expenses also can include payments made to third parties that are critical to the drilling, operating, or maintaining of an oil and gas property. Such payments can take the form of administrative expenses, rentals, extensions, minimum payments, or damage payments made to surface or mineral interest owners.

51.     Regardless of when an Operator is reimbursed by Non-Op Working Interest Owners through JIBs, the Operator must continue to pay Lease Operating Expenses in a timely fashion.  Failure to pay Lease Operating Expenses when due could result in the Operator's removal as Operator under the JOA or, as discussed in the Lease Operating Expenses Motion, the perfection and/or enforcement of liens on the Debtor's assets.

52.     Debtor is Operator for 975 of the wells in which it owns an interest.  On the 15th of each calendar month, Debtor generates and sends JIBs for Lease Operating Expenses incurred in the previous month to each Non-Op Working Interest Owner in an oil and gas property operated by Debtor.  The timing of JIB payments from Non-Op Working Interest Owners can vary depending on the specific payment arrangement in place, but Non-Op Working Interest Owners typically remit payment to Debtor approximately 30 after receiving their respective JIB.

*Fuel Expenses*

53.     The wells Debtor operates are managed by field employees typically referred to as "pumpers."  Each pumper is responsible for approximately 30 to 60 wells and spends each work day traveling to and from the wells he or she oversees to conduct regular in-person inspections and monitoring.[5]  Thus, because Debtor's operated wells are located across a broad, geographic area and because such wells require regular, in-person inspections and monitoring, Debtor incurs substantial, but necessary, fuel expenses ("Fuel Expenses").

---

[5] These field workers are employees of Augustus Energy Partners II and provide services to Debtor under the MSA.

54.     Debtor maintains a company credit card account ("Enterprise Card") with Enterprise Fleet Management ("Enterprise") to permit the field works to purchase fuel for their vehicles.  Field workers purchase approximately $12,000 in fuel per month on credit using the Enterprise Card.

55.     Maintaining the Enterprise Card for fuel purchases by field workers is essential to the continued operation of the Debtor's business.  If Enterprise refuses to extend credit to Debtor after the Petition Date, Debtor's field workers will be unable to purchase fuel for their vehicles on an as-needed basis, which could significantly disrupt the Debtor's business and seriously impact the operation of its wells.

*Joint Interest Billings*

56.     Debtor owns Non-Op Working Interests in approximately 600 gas properties.  In such circumstances, a third party acts as Operator and is charged with the daily operations and the Lease Operating Expenses associated therewith.  Debtor's primary responsibility with respect to its Non-Op Working Interests is to timely pay the Operators for its *pro rata* share of Lease Operating Expenses through JIBs.

57.     The Operator of an oil and gas property commonly is granted a contractual and/or statutory lien on Non-Op Working Interest Owners' interests in the oil and gas property to secure the payment of obligations owed to the Operator.  As such, failure to timely pay JIBs owed by Debtor is likely to result in Operators asserting lien rights under applicable state laws on the Debtor's interests in the oil and gas leases or the production therefrom.  If asserted, such liens could restrict the Debtor's ability to dispose, transfer, or otherwise alienate its property, potentially impairing the Debtor's businesses.

*Gathering Expenses*

58.    Debtor generally markets its natural gas products under annual contracts referencing monthly published prices.  In order to effectively market or sell production from gas properties Debtor operates, Debtor, as Operator and as a Non-Op Working Interest Owner, will make contractual arrangements (the "Marketing Arrangements") by which it is required to pay expenses for gathering, transportation, treating, dehydration, compression, processing, fractionation, and other similar services necessary or desirable to transport natural gas production to market in a condition ready for sale (the "Gathering Expenses").

59.    Debtor similarly may incur Gathering Expenses on non-operated oil and gas properties where Debtor makes its own Marketing Arrangements by electing to take its production "in-kind," separate and apart from the other Working Interest Owners rather than requesting that the third-party Operator market the production associated with Debtor's Non-Op Working Interests on Debtor's behalf.  Where Debtor takes its production in-kind, Debtor similarly will incur Gathering Expenses.

60.    Debtor's Gathering Expenses fall into two categories.  First, Debtor markets its gas through a gathering system it owns, which consists of 400 miles of low pressure gas gathering lines, compression sites and equipment, and 175 miles of high pressure discharge lines through which it markets 14.1 MMcf/d.  This system is known as the Yuma Gathering System ("YGS").  Approximately 80% of the gas volume that passes through the YGS derives from the Debtor's Working Interests, both from wells Debtor operates as well as wells in which Debtor holds a Non-Op Working Interest and takes its gas in kind.  The remaining 20% of gas that passes through the YGS comes from the Working Interests of third-parties.  Debtor pays the

expenses of operating the YGS (the "YGS Expenses"), which include, but are not limited to, expenses for compressor rental, administration, maintenance, and services.

61.     Second, Debtor markets its gas, both as Operator and as a Non-Op Working Interest Owner, by taking its gas in kind, through a gathering system owned by Foundation Energy Management, LLC ("Foundation").   Foundation sends Debtor a bill for Gathering Expenses incurred in the marketing of Debtor's gas through Foundation's gathering system ("FGS Expenses").

62.     Debtor's compliance with the Marketing Arrangements and timely payment of the Gathering Expenses is critical to Debtor's ability to receive revenue from production that it markets on behalf of itself and Non-Op Working Interest Owners (the "Marketed Production"). Failure to receive such revenue would directly threaten and potentially eliminate the Debtor's ability to make timely payments to third parties holding an interest in production, such as Mineral Payees and Working Interest Owners.

63.     Debtor's counterparties to the Marketing Arrangements commonly will have possession and, at times, title to the Marketed Production.   Accordingly, failure to pay Gathering Expenses when due could result in such counterparties refusing to release production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production.

64.     In instances where delivery of Marketed Production is refused, Debtor may be forced to shut-in a well.   Shutting in a well may have economic consequences to Debtor beyond temporary cessation of production and revenue therefrom.   The act of shutting in a well can trigger obligations to other interest holders in that well, including payment obligations or potential forfeiture of Debtor's interest under the terms of an oil and gas lease.   Without seamless

compliance with its Marketing Arrangements and the ability to make Debtor's production marketable for sale, Debtor's revenue stream and ability to operate its business potentially would be severely impaired.

*Goods Delivered Within Last 20 Days and Outstanding Orders*

65.     Debtor has received certain goods in the ordinary course of business from its vendors within the 20 days prior to the Petition Date.  In addition, Debtor may have outstanding orders for goods that will not be delivered until after the Petition Date.

**Cash Management Motion**

66.     By the Cash Management Motion, Debtor seeks authorization to maintain its current bank account and cash management system and to confirm that post-petition amounts owed under the MSA between Debtor and Augustus Partners II are entitled to administrative expense status and payment in the ordinary course of business.

67.     Debtor's existing bank account and cash management system and procedures ("Cash Management System") are structured to maximize efficiency within the Debtor's internal financial operations.  In the ordinary course of business, Debtor uses the Cash Management System to streamline collection, transfer, and disbursement of funds generated by Debtor's business operations.

68.     Prior to the commencement of this chapter 11 case, in the ordinary course of its business, Debtor maintained a single bank account (the "Bank Account") with First Interstate Bank ("First Interstate"), account number ending in 2098.  Debtor uses the Bank Account to receive all revenue from operations and to pay all operating expenses (including payments made to Interest Owners).

69.     Debtor believes that the Bank Account is in a financially stable banking institution (First Interstate), with FDIC insurance (up to a $250,000 applicable limit, if any).

70.     Debtor has a centralized accounting and cash management and accounting system through which it manages all revenue and expenses, including Mineral Payments, Working Interest Disbursements, JIBs, Lease Operating Expenses, Gathering Expenses, and tax payments. The cash management system benefits the Debtor in significant ways, including the ability to: (i) control corporate funds; (ii) ensure availability of funds when necessary; (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information; and (iv) administer the Bank Account as required to affect the collection, disbursement, and movement of cash.

71.     As explained above, pursuant to the MSA, although Debtor is the Operator of record for the wells it operates, Augustus Partners II employees manage all accounting and back office matters and run the Debtor's field operations.   Under the MSA, Debtor pays—in the ordinary course of business—a flat monthly management fee of $100,000 for rent, accounting, and back office services provided by Augustus Partners II and makes additional periodic payments to Augustus Partners II to reimburse Augustus Partners II for field employee wages and benefits as well as certain other pass-through vendor and operational expenses.   Although Augustus Partners II employees perform all accounting and back office services for Debtor under the MSA, Debtor and Augustus Partners II maintain entirely separate books and records and bank accounts.

72.     Because the Debtor itself does not have any employees, it relies entirely on Augustus Partners II employees for the operation of the Debtor's Assets.   Without such

employees and the other services provided by Augustus Partners II, Debtor would cease to function and the value of Debtor's Assets would quickly plummet.

## Utilities Motion

73.     By the Utilities Motion, Debtor seeks an order prohibiting its utility providers from altering, refusing, or discontinuing service to Debtor, providing adequate assurance of payment to such utilities, and establishing certain procedures for resolving requests from Debtor's utility providers to provide further adequate assurance.

74.     In connection with its business, the Debtor incurs utility expenses in the ordinary course of business for, among other things, water and sewer, electricity, gas, telephone, data services, waste removal and other similar services (collectively, the "Utility Services") from various utility companies and other providers (the "Utility Providers").

75.     In the prepetition period, the Debtor paid a monthly average of approximately $37,600.00 to the Utility Providers for Utility Services.  The Debtor has paid all amounts owed to the Utility Providers coming due prior to the Petition Date.

## Claims Agent Motion

76.     By the Claims Agent Motion, Debtor seeks authority to retain a claims agent to assist in the notification of persons and entities required to be notified of the key events in this chapter 11 proceeding.

77.     Debtor estimates that its Creditors Matrix will contain more than 2000 unique names, including current and former Royalty Owners, Working Interest Owners, vendors, contract counterparties, and other persons entitled to notice under the Bankruptcy Code and associated rules.

### Hedging Motion

78.     Debtor is also filing a *Motion for an Order (I) Authorizing the Debtor to (A) Enter into Postpetition Hedge Agreements and (B) grant Liens and Superpriority Claims, and (II) Granting Related Relief* (the "Hedging Motion"), which seeks entry of a final order authorizing, among other things, Debtor to enter into post-petition hedging agreements.

79.     As is customary in the E&P industry, the Debtor has, since its inception in 2013, routinely and in the ordinary course of business entered into hedging arrangements to limit risk exposure in connection with the pricing of oil and natural gas.  Hedging arrangements are important to E&P companies because they "lock in" the price at which a company sells a specified volume of production, thereby stabilizing the company's future cash flows.   For the volume of production that remains unhedged, a company will bear the full brunt of depressed prices or alternatively reap the full benefit of higher prices.

80.     Hedging arrangements are relatively standard in the Debtor's industry because oil and natural gas prices are particularly volatile.  These agreements, in effect, act as an insurance policy against precipitous declines in commodity prices.  In exchange for protection against significant "downside" exposure, companies agree to cap their revenues at a certain level for the hedged portion of their production.  Because hedges only last a specified amount of time (typically one to three years), hedges cannot entirely insulate a company from the impact of a sustained downturn in a commodities market—such as the one recently experienced by the natural gas industry.  They do, however, provide a vital measure of protection by guaranteeing certain cash flows during the hedged period.  This stability not only allows companies to plan for this time period, but assures their lenders and creditors that they will have enough revenues to service their debt and meet other financial obligations.

81.     The postpetition hedge agreements the Debtor seeks authority to enter into will provide significant benefits to the Debtor, including without limitation, helping to insulate the Debtor from major declines in commodity prices and rending its assets more marketable to potential purchasers.   Entering into such agreements is consistent with Debtor's historical practice, is in the best interests of its estate, and the relief requested Hedging Motion has the support of Wells Fargo.   The Debtor is not seeking first day relief with respect to the Hedging Motion and will serve it in accordance with applicable bankruptcy notice provisions.

*[Remainder of this page intentionally left blank]*

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct to my best knowledge, information and belief.

DATED: March 14, 2018.

Steven D. Durrett
President and Chief Executive Officer
Augustus Energy Resources, LLC