## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AUGUSTUS ENERGY RESOURCES, LLC,[1] | ) | Case No. 18-10580 (LSS) |
| | ) | |
| Debtor. | ) | **Hearing Date: TBD** |
| | ) | **Objection Date: TBD** |
| | ) | |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING
PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) APPROVING THE FORM
AND MANNER OF NOTICE THEREOF, (C) SCHEDULING AN AUCTION AND SALE
HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, AND (E) GRANTING RELATED RELIEF AND (II)
AN ORDER (A) APPROVING THE PURCHASE AGREEMENT BETWEEN THE
DEBTOR AND THE PURCHASER, (B) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (D)
<u>GRANTING RELATED RELIEF</u>**

Augustus Energy Resources, LLC, as debtor and debtor in possession in the above-

captioned chapter 11 case ("<u>Augustus Resources</u>" or "<u>Debtor</u>")[2] respectfully states the following

in support of this motion:

### <u>Jurisdiction and Venue</u>

1.    The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number,
is Augustus Energy Resources, LLC (6220).  The location of the Debtor's corporate headquarters and
service address is: 2016 Grand Avenue, Billings, MT 59102.

[2] A detailed description of the Debtor and its business, and the facts and circumstances supporting this
motion and the Debtor's chapter 11 case, are set forth in greater detail in the *Declaration of Steven D.
Durrett, President and Chief Executive Officer of Augustus Energy Resources, LLC in Support of Chapter
11 Petition and First-Day Motions* (the "<u>First-Day Declaration</u>").

February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion (the "Motion") to the extent that it is later determined that the Court, absent consent, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The grounds for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

## Background

4.      Augustus Resources is a privately owned, natural gas exploration, development and production company. The Debtor owns operating and non-operating working interests in approximately 1,575 natural gas wells in the eastern portion of the DJ Basin in eastern Colorado, primarily in Yuma County, as well as certain personal property, including buildings, equipment, transportation equipment, machinery, gathering systems, compressors, and a pipeline system (together, the "Debtor's Assets").

5.      On March 16, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating the above-referenced bankruptcy case (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case.

## Preliminary Statement

6.      The Debtor is a Delaware limited liability company formed in 2013 to own and operate the Debtor's Assets and to pursue other natural gas opportunities.  As explained in more detail below, Augustus Energy Partners II, LLC ("Augustus Partners II") provides back office and management services to the Debtor for which it receives a monthly management fee pursuant to the Management Services Agreement (as amended, the "MSA") between the Debtor and Augustus Partners II.

7.      In December 2013, the Debtor purchased certain assets from Augustus Energy Partners ("AEP") for approximately $104,000,000, of which the Debtor paid approximately $73.6 million in cash, and assumed approximately $31 million as debt from a prior existing secured credit facility.[3]  The Debtor financed the acquisition with approximately $56 million in equity and $54 million in senior secured debt (the "Senior Secured Credit Facility") pursuant to that certain *Credit Agreement* dated as of December 3, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among the Debtor, as borrower, Wells Fargo Bank, National Association, as administrative agent, a letter-of-credit issuer, swap provider, and lender (in such capacities, the "Pre-Petition Lender"), along with other instruments, agreement, or documents executed in connection therewith (collectively, the "Pre-Petition Claim Documents").  To close the acquisition, the Debtor drew down approximately $54 million of the Senior Secured Credit Facility, which was and is secured by substantially all of the Debtor's Assets.  The Senior Secured Credit Facility has an initial borrowing base of $75 million and a maximum credit amount

---

[3] The Debtor also purchased AEP's hedge position in various ISDA agreements for approximately $10 million.

of $200 million. As of the Petition Date, Wells Fargo is the agent and sole Pre-Petition Lender under the Credit Agreement.

8.    The Debtor's gas properties encompass approximately 148,000 gross acres (102,000 net) in the eastern DJ Basin in Yuma County, Colorado. Approximately 80% of the Debtor's acreage is held by production. The 1,575 wells in which the Debtor owns interests draw from shallower zones (1,800' to 3,000' depth) in the Niobrara formation and include long-lived reserves, with consistent production and slow rates of decline. Recent net production was approximately 12,000 MMcf/d.[4] The Debtor continues to control a significant leasehold position in northeastern Colorado; however, due to the decline in natural gas prices and the Debtor's financial condition, Debtor has ceased drilling new gas wells.

9.    In addition, the Debtor also owns 400 miles of low pressure gathering lines, compression sites and equipment, and 175 miles of high pressure discharge lines through which it markets 14.1 MMcf/d. This system is known as the Yuma Gathering System. The services for the operation of the gathering, compression, and pipeline systems are performed by Augustus Partners II on behalf of the Debtor pursuant to the MSA. For the year ending December 31, 2017, the Debtor generated approximately $11.0 million in upstream gas revenue compared to $27.6 million for the 13 months ending December 31, 2014. This nearly 60% reduction in generated revenue reflects the collapse in the price of natural gas and decline in production between 2014 and today and its impact on the Debtor's operations.

10.    At the time of the closing of the December 2013 acquisition, the Debtor had excess cash on hand, and in January 2014 and used it along with operating cash flow to pay down the

---

[4] "MMcf" is a unit of measurement equaling one million cubic feet, a common measure of gas volume in the gas industry.

outstanding loan balance from $54 million to $50.5 million. Thereafter, the Debtor made regular monthly payments totaling $22.5 million under the Senior Secured Credit Facility. At the same time, the market price of natural gas underwent a steady decline with the result that by the beginning of 2017, the Debtor's borrowing base, which was subject to a twice annual redetermination pursuant to the Pre-Petition Claim Documents, had declined to $21 million as of June 2017.

11.     Notwithstanding the substantial monthly payments from the Debtor to the Pre-Petition Lender, the outstanding principal balance due under the Senior Secured Credit Facility in July 2017 was $28 million and the Debtor was in default under the Pre-Petition Claim Documents. The commodity price decline curtailed additional drilling to increase production and, as a result, the Debtor found itself unable to meet debt covenants notwithstanding significant efforts to reduce operational expenditures.

12.     Like many gas companies across the country, the Debtor considered various proactive steps to stabilize its financial position, including minimizing capital expenditures and not pursuing any new drilling projects, and, to the extent possible, reducing operational expenditures. In April 2016, the Debtor and Augustus Partners II amended the MSA and reduced the monthly management fee payable to Augustus Partners II by 30% and deleted any cost of living adjustment even though there were no changes in the management responsibilities required to own and operate the Debtor's wells and gathering and pipeline systems.

13.     Notwithstanding the Debtor's efforts to pay-down the amounts due Wells Fargo under the Senior Secured Credit Facility from monthly cash flow and to otherwise reduce expenses of the company, such actions did not enable the Debtor to keep ahead of the borrowing base redeterminations resulting from the collapse in the price of natural gas.

14.     In 2015, certain royalty owners (the "Plaintiffs") sued Debtor in the United States District Court for the District of Colorado, Case No. 15-cv-00835-KLM, captioned *Melissa Clarke Crichton v. Augustus Energy Resources, LLC* ("Royalty Lawsuit").  The Plaintiffs claim that the Debtor improperly charged royalty owners certain post-production processing and transportation costs. The Debtor disputes the Plaintiffs' claim that it improperly calculated royalty payments due. On March 31, 2017, the Court granted the Plaintiffs' motion to certify the case as a class action to include in the class, with a few exceptions, all royalty and overriding royalty owners from whom (beginning in December 2009) the Debtor or its predecessors took post-production deductions unless the operative oil and gas lease expressly permits those deductions (collectively, the "Royalty Claimants Class").

15.     Having explored other alternatives with the assistance of its advisors, the Debtor has determined that a sale of substantially all of its Assets would maximize the value of its estate for all stakeholders.

16.     In order to fully and adequately market its Assets, the Debtor engaged TenOaks Energy Advisors LLC ("TenOaks") to serve as its broker to assist in the sale of the Debtor's Assets. Prior to the Petition Date, TenOaks employed a comprehensive marketing process to identify potential bidders for the Assets.  Specifically, between from late August 2017 through early October 2017, TenOaks contacted approximately 8,000 potential interested parties, representing both financial and strategic potential buyers.  Of these contacted potential bidders, approximately twenty-four (24) either reviewed a teaser document or participated in high-level discussions about a potential transaction.  The Debtor entered into confidentiality agreements with twenty-four (24) such interested parties, who obtained access to a virtual data room containing detailed information about the Assets, including detailed financial, geological, and land data, among other things.  The

Debtor's management and TenOaks also invited interested parties to participate in initial discussions regarding the proposed transaction opportunity and to ask questions about the Assets. Ultimately, two parties submitted written offers and one party submitted an oral offer for the Assets. As demonstrated, the Assets have been exposed to the market in a lengthy and thorough pre-Petition Date marketing process. The Debtor, along with the assistance of TenOaks, will continue to market the Assets during the pendency of the Debtor's Chapter 11 Case through the sale process described below.

17.    With TenOaks' assistance, the Debtor's marketing efforts were successful, and the Debtor has identified a party to serve as stalking-horse bidder for its Assets. Specifically, OWN Resources, LLC (the "Stalking-Horse Bidder") has executed that certain *Asset Purchase Agreement*, dated as of March 15, 2018 (including all exhibits and schedules related thereto, the "Purchase Agreement"), whereby the Stalking-Horse Bidder proposes to purchase substantially all of the Debtor's Assets (the "Stalking-Horse Bid") for cash consideration of approximately $14.2 million (the "Purchase Price"), which will serve as a competitive baseline for bids for recovery by the Debtor's stakeholders. The proposed transaction, if approved, will generate significant value for the Debtor's estate, and, among other things, will satisfy a significant portion of the prepetition claims against the Debtor and its estate in a manner that maximizes value for all stakeholders.

18.    The Debtor now seeks authority to market test the transactions contemplated by the Purchase Agreement to ensure that the Debtor obtains the highest or otherwise best offer for the Debtor's Assets. If approved, the proposed bidding procedures (the "Bidding Procedures") proposed herein will enable the Debtor to move expeditiously towards a sale of the Debtor's Assets. As set forth in further detail below, the proposed sale, the Purchase Agreement, the Bidding Procedures, and the related relief requested in this Motion are in the best interests of the

Debtor's estate and its stakeholders.  Accordingly, the Debtor respectfully requests that the Court grant this Motion.

### Relief Requested

19.    The Debtor seeks entry of an order, substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), and pursuant to section 105, 363, 365, 503, and 507 of the Bankruptcy Code:

     (a)    authorizing and approving the Bidding Procedures, attached to the Bidding Procedures Order as Exhibit 1 and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Assets;

     (b)    approving the form and manner of notice of an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the sale of the Assets free and clear of all liens, claims, encumbrances, and other interests (the "Sale"), attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice"), including notice to contract counterparties and holders of certain hard consents and preferential purchase rights;

          (i)    scheduling the Auction and Sale Hearing, and establishing an objection deadline with respect to the Sale Hearing;

          (ii)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assigned Contracts"); and

     (c)    granting related relief.

20.    In addition, the Debtor will seek entry of an order at the conclusion of the Sale Hearing, substantially in the form attached hereto as Exhibit B (the "Sale Order"):

     (a)    authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Successful Bid;

     (b)    authorizing and approving the Sale of substantially all of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

          (i)    authorizing the assumption and assignment of the Assigned Contracts; and

          (ii)    granting any related relief.

21.     The Debtor reserves the right to file and serve any supplemental pleading or declarations that the Debtor deems appropriate or necessary in its reasonable business judgment, including any pleading summarizing the competitive bidding and Sale process and the results thereof, in support of its request for entry of the Sale Order before the Sale Hearing.

### The Proposed Sale

a)     **The Proposed Purchase Agreement and Contemplated Section 363 Sale.**

22.     The Debtor entered into arm's-length negotiations with the Stalking-Horse Bidder to finalize agreeable terms of the Stalking-Horse Bid for the Sale of the Assets.  The Debtor believes a prompt Sale of the Assets provides the best alternative available for all stakeholders in this Chapter 11 Case.

23.     The Debtor respectfully requests that the Court approve the following general timeline for the Bidding Procedures:

- *Contract Cure Objection Deadline:* 4:00 p.m. (prevailing Eastern Time) fourteen (14) calendar days from service of the Contract Notice (as defined herein), as the deadline to object to the cure amounts listed in the Contract Notice;

- *Bid Deadline:* on or before 4:00 p.m. (prevailing Eastern Time) on June 1, 2018, as the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders (as defined in the Bidding Procedures)) must be actually received (the "Bid Deadline");

- *Auction:* 11:00 a.m. (prevailing Eastern Time) or 9:00 a.m. (prevailing Mountain Time) on June 8, 2018, as the date and time the Auction, if needed, will be held at the offices of Davis Graham & Stubbs LLP, located at 1550 17th Street, Suite 500, Denver, Colorado 80202;

- *Sale Objection Deadline:* 4:00 p.m. (prevailing Eastern Time), on or before seven (7) calendar days after the Bid Deadline, as the deadline to object to the Sale;

- *Sale Hearing:* on or before June 14, 2018, at 11:00 a.m. (prevailing Eastern Time), as the date and time for the Sale Hearing.

24.     The Debtor believes that this timeline maximizes the prospect of receiving the highest or otherwise best offer without unduly prejudicing the Debtor's estate.  To further ensure that the Debtor's proposed Auction and Sale process maximizes value to the benefit of the Debtor's estate, the Debtor, with the assistance of TenOaks, will use the time following entry of the Bidding Procedures Order to continue to actively market the Assets in an attempt to solicit higher or otherwise better bids.  The Debtor believes the relief requested by this Motion is in the best interests of its creditors, its other stakeholders, and all other parties in interest, and should be approved.

### b)     Material Terms of the Purchase Agreement.

25.     The following chart summarizes terms and conditions of the Purchase Agreement (attached hereto as Exhibit C) and discloses certain information pursuant to Local Rule 6004-1.[5]

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Acquired Assets | Acquired Assets:<br>Includes all right, title and interest of Debtor in, to or under all assets and properties, of any kind and description, owned, licensed, leased or otherwise held by Debtor, including certain specified categories of assets identified in § 1.1(b) of the Purchase Agreement (but, in all cases, excluding the Excluded Assets).<br>Purchase Agreement, § 1.1(b)(i) – (xiii) |
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Assigned Contracts | Assigned Contracts:<br>Purchase Agreement, § 1.1(b)(vii); identified in Exhibit E to Purchase Agreement. |

---

[5] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Purchase Agreement, the Purchase Agreement shall govern in all respects.  Capitalized terms used in the summary shall have the meanings ascribed to them in the Purchase Agreement.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Purchase Agreement.

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Assumed Liabilities | Assumed Liabilities:<br><br>Buyer shall assume and agree to pay, perform, discharge or otherwise satisfy, when due, certain identified categories of liabilities as identified in § 1.3 of the Purchase Agreement.<br><br>Purchase Agreement, § 1.3 |
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Excluded Contracts | Excluded Contracts:<br><br>Purchase Agreement, § 1.2(f); identified in Schedule 1.2(f) to Purchase Agreement. |
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Excluded Liabilities | Excluded Liabilities:<br><br>Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform, discharge or otherwise satisfy any Liability, Claim or Encumbrance of Debtor, and Debtor shall be solely and exclusively liable with respect to all Liabilities, Claims and Encumbrances of Debtor, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Excluded Liabilities include certain identified categories of liabilities as identified in § 1.4 of the Purchase Agreement.<br><br>Purchase Agreement, § 1.4 |
| Del. Bankr. L. R. 6004-1(b)(iv)<br><br>Material Term: Purchase Price | Purchase Price:<br><br>The Base Purchase Price is comprised of:<br><br>(a) cash in an amount equal to Fourteen Million Two Hundred Thousand dollars ($14,200,000); and<br><br>(b) the assumption of the Assumed Liabilities, but subject to certain adjustments provided in Sections 7.12 through 7.14.<br><br>Purchase Agreement, § 2.1 |
| Del. Bankr. L. R. 6004-1(b)(iv)(A)<br><br>Sale to Insider | Not Applicable |
| Del. Bankr. L. R. 6004-1(b)(iv)(B)<br><br>Agreements with Management | The Debtor's management and the Stalking Horse Bidder have discussed in broad terms the possibility that some of Augustus Partners II employees may be retained by the Stalking-Horse Bidder Post-Closing. These same employment opportunities will be made available to other possibly interested purchasers in the Auction process. |

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv)(C)<br><br>Releases | Releases and Waivers:<br><br>Buyer waives any and all rights to claim that it is an unsophisticated investor in oil and gas properties.<br><br>Purchase Agreement, § 5.8<br><br>Buyer waives and releases the Debtor and the Debtor's Affiliates for any Liabilities in connection with Buyer's due diligence activities.<br><br>Purchase Agreement, § 6.1(e) |
| Del. Bankr. L. R. 6004-1(b)(iv) (C)<br><br>Releases (cont'd) | The Parties waive all claims for special, indirect, exemplary, consequential or punitive damages arising out of, associated with, or relating to the Purchase Agreement.<br><br>Purchase Agreement, § 12.5<br><br>Buyer hereby expressly waives any and all rights or remedies with respect to any defect in title or any other title matter, with respect to the Assets upon the terms and subject to the conditions of the Sale Order.<br><br>Purchase Agreement, § 7.8(e)<br><br>The Parties irrevocably waive the defense of inconvenient forum to the maintenance of any Action or Proceeding in the Bankruptcy Court to enforce the Purchase Agreement and decide any claims or disputes which may arise or result from or be connected with the Purchase Agreement, any breach or default thereunder or the transactions contemplated thereby …. The Parties irrevocably waive the defense of an inconvenient forum to the maintenance of an Action or Proceeding in a Delaware state court or a federal Delaware court, in the event that the Bankruptcy Case is closed.<br><br>Purchase Agreement, § 12.12(b)<br><br>The Parties irrevocably waive all right to trial by jury in any Action, Proceeding or counterclaim arising out of or relating to the Purchase Agreement or the actions of Debtor, Buyer or their respective representatives in the negotiation or performance thereof.<br><br>Purchase Agreement, § 12.12(c) |

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv)(D)<br><br>Private Sale/No Competitive Bidding | Auction:<br><br>An auction is contemplated and is to be conducted pursuant to the Bidding Procedures.<br><br>Purchase Agreement, § 6.4(a)<br><br>The Purchase Agreement does not restrict Debtor from continuing to solicit inquiries, proposals or offers from third parties for the Assets.<br><br>Purchase Agreement, § 6.7 |
| Del. Bankr. L. R. 6004-1(b)(iv)(E)<br><br>Closing and Other Deadlines | Deadlines:<br><br>The closing of the sale of the Assets shall take place no later than three (3) Business Days following the date on which the conditions set forth in Article 8 and Article 9, including entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, have been satisfied or waived.<br><br>Buyer or Seller may terminate the Purchase Agreement if the Closing has not occurred by the close of business on August 1, 2018.<br><br>Purchase Agreement, § 3.1; § 8.5; § 9.2; § 10.1(d) |
| Del. Bankr. L. R. 6004-1(b)(iv)(F)<br><br>Good Faith Deposit | Deposit:<br><br>Prior to or substantially concurrent with execution of the Purchase Agreement, Buyer has or shall pay to the Escrow Agent a deposit in the amount of 7.5% of the Base Purchase Price. If Closing occurs, the Deposit shall be credited against the amount required to be paid by Buyer to Debtor at Closing.<br><br>If the Purchase Agreement is terminated by Debtor prior to Closing pursuant to Section 10.1(c), or the conditions to the obligations of Buyer to consummate the Closing set forth in Article 8 shall have been expressly waived in writing by Buyer or satisfied, but Buyer shall have failed to perform its obligations under Section 3.3 after notice as provided in Section 10.1(c), then the Parties shall jointly instruct the Escrow Agent to pay the Deposit to Debtor as liquidated damages (and not as a penalty).<br><br>If Buyer is not the Successful Bidder, or the Bankruptcy Court does not approve the Sale Order or the Bidding Procedures Order, or if the Purchase Agreement is terminated prior to Closing for any other reason, then the Parties shall jointly instruct the Escrow Agent to return the Deposit to Buyer within five (5) Business Days of such termination.<br><br>Purchase Agreement, § 2.2 |
| Del. Bankr. L. R. 6004-1(b)(iv)(G)<br><br>Interim Arrangements with Proposed Buyer. | Buyer and Debtor (or its vendors or affiliates) may enter into arm's-length transition agreements mutually acceptable to the parties to assist the Buyer in the transition of the Assets to the Buyer.<br><br>Purchase Agreement, § 6.3(d) |

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv) (H)<br><br>Use of Proceeds | Use of Proceeds:<br><br>Proceeds from the Sale will be used (a) to pay the Pre-Petition Lender on account of its valid, perfected, first-priority liens, and (b) to fund any Carve-Outs for the payment of reasonable professional fees and expenses approved by the Bankruptcy Court, including the reasonable and court-approved fees and expenses of TenOaks as the Debtor's broker. |
| Del. Bankr. L. R. 6004-1(b)(iv)(I)<br><br>Tax Exemption | While the Purchase Agreement contains provisions regarding the allocation of taxes and tax risks between the parties, the Purchase Agreement does not attempt to have the sale declared exempt from taxes in any manner.<br><br>Purchase Agreement, § 7.1. |
| Del. Bankr. L. R. 6004-1(b)(iv) (J)<br><br>Record Retention | Record Retention:<br><br>For five (5) years after the Closing Date Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets.<br><br>Purchase Agreement, § 7.7 |
| Del. Bankr. L. R. 6004-1(b)(iv) (K)<br><br>Sale of Avoidance Actions | Avoidance Claims under chapter 5 of the Bankruptcy Code:<br><br>All Avoidance Actions (i.e., any and all claims for relief of Debtor under chapter 5 of the Bankruptcy Code), including any proceeds thereof, are Excluded Assets and will not be transferred pursuant to the Purchase Agreement.<br><br>Purchase Agreement, § 1.2(p), 13.1 |
| Del. Bankr. L. R. 6004-1(b)(iv)(L)<br><br>Requested Findings as to Successor Liability | Request for Findings Regarding Successor Liability:<br><br>The Sale Order will contain express provisions that (a) the winning purchaser (whether the Stalking-Horse Purchaser or some other successful purchaser) shall not have successor liability, and (b) such successful purchaser shall have no liability for any alleged claim arising out of the Royalty Lawsuit for any time prior to the Closing Date. |

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(b)(iv)(M)<br><br>Sale Free and Clear of Unexpired Leases and Other Rights. | The Purchase Agreement provides that the Debtor provide written notice of the Bidding Procedures Order, the Bidding Procedures, the Auction and the Sale Hearing to each holder of a Hard Consent right and Preferential Purchase Right. The Purchase Agreement further requires that the Debtor request the Bankruptcy Court deem such notice as commencing the notice period under any applicable contract containing a Hard Consent right or a Preferential Purchase Right. Finally, the Purchase Agreement requires that the Debtor request that the Bankruptcy Court enter a Sale Order that provides that if a holder of a Hard Consent right or Preferential Purchase Right failed to timely object to the notices provides hereunder, that such holder's Hard Consent shall be deemed to be provided and such Preferential Purchase Right holder shall be deemed to have elected not to exercise such right, respectively, and so state in the Sale Order.<br><br>Purchase Agreement, § 1.6, § 7.11(a) |
| Del. Bankr. L. R. 6004-1(b)(iv)(N) Credit Bid. | Credit Bid:<br><br>Any Qualified Bidder, including the Stalking-Horse Bidder, that has a valid, perfected, and unavoidable lien on any assets of the Debtor's estate, specifically including the Pre-Petition Lender or its designated representative(s), may credit bid at any time, in such creditor's sole and absolute discretion, any portion and up to the entire amount of its claim in conjunction with any sale of the Debtor's assets pursuant to Bankruptcy Code section 363(k), subject to any prior, unavoidable lien of the Pre-Petition Lender pursuant to the terms of any cash collateral order or otherwise (the "Credit Bid Right").<br><br>Bidding Procedures, Art. XI. |
| Del. Bankr. L. R. 6004-1(b)(iv) (O)<br><br>Relief from Bankruptcy Rule 6004(h). | Relief from Fourteen-Day Stay:<br><br>Pursuant to this Motion, Debtor seeks an order waiving the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

| Purchase Agreement Provision | Summary Description |
|---|---|
| Del. Bankr. L. R. 6004-1(c)(i)(C)<br><br>Bid Protections to Stalking-Horse Bidder | Breakup Fee/Bidding Increments:<br><br>Buyer shall be entitled to payment of a break-up fee (the "Break-Up Fee") payable by Seller to Buyer in an amount of three percent (3%) of the Base Purchase Price, if Debtor enters into (or provides written notice to Buyer of its intent to enter into) one or more Alternative Transactions with one or more Persons other than Buyer or the Successful Bidder at the Auction.<br><br>Purchase Agreement, § 10.1(a)(vii); § 13.1.<br><br>Buyer shall be entitled to payment of an expense reimbursement (the "Expense Reimbursement") equal to the reasonable documented out-of-pocket costs and expenses of Buyer related to negotiating the Purchase Agreement and investigating Debtor and the Assets in the aggregate up to a maximum amount of $300,000, which amount, upon entry of the Bidding Procedures Order, shall constitute an administrative expense of Debtor under sections 503(b) and 507(a)(2) of the Bankruptcy Code, if Debtor enters into (or provides written notice to Buyer of its intent to enter into) one or more Alternative Transactions with one or more Persons other than Buyer or the Successful Bidder at the Auction<br><br>Purchase Agreement, § 10.1(a)(vii); § 13.1.<br><br>Any Overbid (other than the Initial Minimum Overbid, which will be $14,726,000 plus the Expense Reimbursement) shall be in increments in cash (or, in the case of the Pre-Petition Lender exercising its Credit Bid Right, in the form of a credit bid) of $100,000 (the "Overbid Increment").<br><br>Bidding Procedures Art. VIII.B.1. |

26.    By separate motion[6] filed contemporaneously herewith, the Debtor seeks entry of an order, among other things, for authority to enter into and perform under certain post-petition hedging transactions subject to ISDA agreements (the "Hedge Agreements"). A key component of the Purchase Agreement requires the Debtor, under certain circumstances, to assign to and novate in favor of the Stalking-Horse Bidder the Hedge Agreements at or around closing. The Debtor requests that any order approving this Motion provide that the Debtor's selection of OWN

---

[6] *Debtor's Motion for an Order (i) Authorizing the Debtor to (a) Enter Into Postpetition Hedge Agreements and (b) Grant Liens and Superpriority Claims, and (ii) Granting Related Relief* [Docket No. [ ]] (the "Hedge Agreements Motion").

Resources, LLC as the Stalking-Horse Bidder occur contemporaneously with the Court's approval of the Hedge Agreements Motion.

**The Bidding Procedures Order**

**A.    The Bidding Procedures.**

27.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.  The following describes the salient points of the Bidding Procedures and highlights certain information pursuant to Local Rule 6004-1.[7]

    (a)    **Bid Requirements (Local Bankr. R. 6004-1(c)(i)(A), (B)).**  Any bid by an Acceptable Bidder (as defined in the Bidding Procedures) must be submitted in writing and determined by the Debtor, in its reasonable business judgment, to have satisfied the following requirements:

        (i)    *Assets and Purchase Price:*  Each Bid must be a bid to purchase all of the Assets for cash, and must clearly state which liabilities of the Debtor the Acceptable Bidder is agreeing to assume.  Each Bid must clearly set forth the Purchase Price to be paid in cash (or credit bid in the case of the Pre-Petition Lender exercising the Credit Bid Right).

        (ii)    *Deposit:*  Each Bid, including the Stalking-Horse Bid, must be accompanied by a cash deposit in an amount equal to seven and one-half percent (7.5%) of the Base Purchase Price, to be held in an non-interest-bearing escrow account to be identified and established by the Debtor (the "Deposit").

        (iii)    *Minimum Bid:*  The aggregate cash consideration proposed by each bid must be equal to, or exceed, the sum of (i) the Purchase Price of $14,200,000; (ii) plus the Break-Up Fee of three percent (3%) of the Purchase Price ($426,000); (iii) plus the Overbid Increment of at least $100,000 ((i), (ii), and (iii) totaling $14,726,000), and (iv) the Expense Reimbursement, not to exceed $300,000.

        (iv)    *The Same or Better Terms:*  Except as otherwise provided herein, each Bid must, in the Debtor's business judgment and in

---

[7] This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

consultation with the Pre-Petition Lender and the Committee Representatives, if any, be on terms the same as or better than the terms of the Purchase Agreement. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents") that are substantially similar to the Purchase Agreement. The Bid Documents shall include a schedule of Assumed Contracts (pursuant to the Purchase Agreement) to the extent applicable to the Bid, and a copy of the Purchase Agreement clearly marked to show all changes requested by the Acceptable Bidder (including those related to the Purchase Price and Assets to be acquired), as well as all other material documents integral to such Bid.

(v)    ***Sources of Financing:*** Each Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies. Each Bid should include a detailed sources and uses schedule and sufficient written evidence demonstrating that the Bidder has the necessary financial ability and/or has received debt and/or equity funding commitments (or has cash) sufficient in the aggregate to finance and consummate the Alternative Transaction contemplated thereby and provide adequate assurance of future performance under all Assigned Contracts to be assumed and assigned in such Alternative Transaction. Such information shall include the following:

> (1) contact names and telephone numbers for verification of financing sources;

> (2) the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtor; and

> (3) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor.

(vi)    ***Structure:*** Each Bid must identify the structure proposed for undertaking the Sale, including all the Assets of the Debtor, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(vii)    ***Tax Structure:*** Each Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-

free manner or if any incremental tax liabilities will be incurred by the Debtor under the Bid.

(viii)   *Assumption:* Each Bid must specify which, if any, of the obligations of the Debtor the Bidder proposes to assume.

(b)    **Bid Deadline.** Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be *actually received* by the Debtor, counsel to the Debtor, the Debtor's financial advisor, co-counsel to the Debtor, the Stalking-Horse Bidder, counsel to the Stalking-Horse Bidder, the Pre-Petition Lender, and counsel to the Pre-Petition Lender on or before **June 1, 2018 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). Acceptable Bidders that do not submit a Bid by the Bid Deadline will not be eligible to be selected as Qualified Bidders.

(c)    **Right to Credit Bid.** The Pre-Petition Lender shall be deemed to be a Qualified Bidder and is not required to make any Deposit and or submit any Bid Documents. The Pre-Petition Lender (or its designated representative(s)) may credit bid, at any time, in its sole and absolute discretion, any portion and up to the entire amount of its secured claim, at any time on any individual asset, portion of the assets, or all Assets constituting its Collateral in conjunction with any sale of the Debtor's Assets (the "Credit Bid Right"). Upon exercise of the Credit Bid Right and notwithstanding anything herein, the Pre-Petition Lender's consultation rights shall be suspended with respect to the Debtor's determination of other Qualified Bidders under the Bidding Procedures. In addition, upon such exercise of the Credit Bid Right, the Pre-Petition Lender shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any individual asset, portion of the assets, or all of the Assets, and the Pre-Petition Lender shall have the right to designate any person or entity in its sole and absolute discretion that shall take title to the individual asset, portion of the assets, or all of the Assets that are subject to the Credit Bid Right. In the event the Pre-Petition Lender exercises the Credit Bid Right, and the amount of the credit bid of the Pre-Petition Lender exceeds the total amount of the highest bids for the assets subject to the Credit Bid Right, such credit bid will be deemed the highest and best bid and such credit bid will be accepted by the Debtor and be presented for approval to the Bankruptcy Court. The Pre-Petition Lender will not be a Backup Bidder unless the Pre-Petition Lender consents in writing otherwise.

Subject to the foregoing paragraph, at the Auction, any Qualified Bidder, including the Stalking Horse Bidder, who has a valid, perfected, and unavoidable lien on any assets of the Debtor's estate (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured

Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code subject to any prior, unavoidable lien of the Pre-Petition Lender pursuant to the terms of any cash collateral order entered in the Chapter 11 Case or otherwise; provided that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; provided, further, that for purposes of such Secured Creditor's Qualified Bid, the Secured Creditor's claim shall be deemed to have the value it possesses on the date of the Auction.

(d)     **The Auction.**  If the Debtor receives a Qualified Bid, other than the Stalking Horse Bid, or if the Pre-Petition Lender indicates that it intends to exercise its Credit Bid Right (as defined below) within five (5) business days after receiving from the Debtor the Bids and Qualified Bids and such other information as the Pre-Petition Lender may reasonably request, the Debtor will conduct the Auction to determine the Successful Bidder.  If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtor, in consultation with the Pre-Petition Lender and the Committee Representatives, if any, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid unless the Pre-Petition Lender indicates that it intends to exercise its Credit Bid Right.

(e)     **Bidding Increments (Local Bankr. R. 6004-1(c)(i)(C)).**  Any Overbid following the initial Minimum Overbid or following any subsequent overbid shall be in increments in cash of $100,000.

(f)     **Backup Bidder (Local Bankr. R. 6004-1(c)(i)(E)).**  Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, each Qualified Bidder with the next-highest or otherwise next-best Qualified Bid at the Auction for the Assets(each a "Backup Bid"), shall automatically be a backup bidder (the "Backup Bidder").  Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder.  If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtor, in consultation with the Pre-Petition Lender and the Committee Representatives, if any, may select a Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  Such procedure shall continue until a Successful Bidder consummates the approved transactions contemplated by its successful bid.

(g)     **Highest or Otherwise Best Bid.**  When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor, in consultation with the Pre-Petition Lender and representatives of the creditors' committee, if any, may consider the following factors in addition to any other factors that the Debtor, the Pre-Petition Lender, and the creditors' committee, if any, deem appropriate: (i) the number, type, and nature of any changes to the Purchase Agreement requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to

be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; and (v) the tax consequences of such Qualified Bid.

(h)     **Bids Irrevocable**.    Each Bid must by its terms remain binding and irrevocable until three months after the date of selection of the Successful Bid; *provided* that if the Bid is not selected as the Successful Bid or Backup Bid, the Bid may be revoked after approval of such Successful Bid by the Bankruptcy Court.

(i)     **Reservation of Rights (Local Bankr. R. 6004-1(c)(i)(D))**.    The Debtor reserves its rights, subject to the prior written consent of the Pre-Petition Lender, to modify these Bidding Procedures in its reasonable business judgment, and in consultation with the Committee Representatives, if any, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets.

28.     Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals, and, as noted, preserve the Debtor's right to modify the Bidding Procedures as appropriate to maximize value for the Debtor's estate.

**B.     Form and Manner of Sale Notice.**

29.     On or within three (3) business days after entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, to be served on the following parties or their respective counsel, if known: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) counsel to the creditors' committee, if any; (c) counsel to the Stalking-Horse Bidder; (d) counterparties to the Contracts (the "Contract Counterparties"); (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets, and their respective counsel, if known, including the Pre-Petition Lender's counsel; (g) the

Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtor's other creditors; (j) each member of the Royalty Claimants Class; (k) counsel for the Royalty Claimants Class; (l) the United States Bureau of Land Management; (m) the Colorado State Land Board; (n) each governmental agency that is an interested party with respect to the Sale and the transactions proposed thereunder; and (o) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. In addition, the Debtor will also publish an abbreviated version of the Sale Notice in *The USA Today (National Edition), The Denver Post, The Wray Gazette,* and *The DailyDAC,* at least ten (10) days prior to the Auction.

30.     The Purchase Agreement contains specific notice provisions with respect to (a) holders of the right to consent to the assignment of certain leases (each a "Hard Consent") under pre-petition contracts with the Debtor; and (b) holders of the right to purchase or acquire an Asset in connection with the proposed sale transaction (each a "Preferential Purchase Right") under pre-petition contracts with the Debtor.

31.     The Debtor requests that the Court approve the following notice procedures (the "Hard Consent Rights Notice")[8] with respect to the holders of Hard Consents:

(a)     Within three (3) business days following the entry of the Bidding Procedures Order, the Debtor shall provide to the holder of each Hard Consent written notice of the Bidding Procedures Order, the Bidding Procedures, the Auction, and the Sale Hearing;

(b)     Notice to the holder of a Hard Consent in the manner established in subsection (a) above shall: (i) be deemed to constitute material compliance with any contractual provisions applicable to a Hard Consent requiring such holder's consent to the transactions contemplated under the Purchase Agreement; and (ii) commence any notice period applicable under the contractual provisions governing such Hard Consent that affords such holder a period to provide, waive, satisfy, or withhold such holders' consent to assignment of the applicable lease.

---

[8] The Hard Consent Rights Notice is attached to the Bidding Procedures Order as Exhibit 3.

(c)     If the Debtor provides notice to the holder of a Hard Consent in the manner established in subsection (a) above, and such holder fails to timely object to the Sale by the Sale Objection Deadline, such holder's consent to the transactions contemplated by the Purchase Agreement shall be deemed to be provided.

32.     The Debtor further requests that the Court approve the following notice procedures (the "Preferential Purchase Rights Notice")[9] with respect to the holders of Preferential Purchase Rights:

(a)     Within three (3) business days following the entry of the Bidding Procedures Order, the Debtor shall provide to all of the holders of Preferential Purchase Rights written notice of the Bidding Procedures Order, the Bidding Procedures, the Auction, and the Sale Hearing.  Such notice shall inform such holder that it must submit a notice to the Debtor by the Bid Deadline of such holder's intent to exercise or not exercise its Preferential Purchase Right at the Auction;

(b)     Notice to the holder of a Preferential Purchase Right in the Manner established in subsection (a) above shall (i) be deemed to constitute material compliance with the contractual provisions governing written notice of a proposed transaction with respect to a particular Preferential Purchase Right; and (ii) commence any notice period applicable under the contractual provisions governing such Preferential Purchase Right a period of time to exercise such right.

(c)     If the Debtor provides notice to the holder of a Preferential Purchase Right in the manner established in subsection (a) above, and such holder fails to timely notice the Debtor by the Bid Deadline of such holder's intent to exercise or not exercise its Preferential Purchase Right at the Auction, such holder shall be deemed to not elect to exercise its Preferential Purchase Rights.

33.     The Debtor submits that the Sale Notice, the Hard Consent Rights Notice, and the Preferential Purchase Rights Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific

---

[9] The Preferential Purchase Rights Notice is attached to the Bidding Procedures Order as Exhibit 4.

identification of the Assets; (e) instructions for promptly obtaining a copy of the Purchase Agreement; (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; (g) that the Purchaser shall have no successor liability for pre-closing date matters; and (h) notice of the proposed assumption and assignment of the Contracts to the Stalking-Horse Bidder pursuant to the Purchase Agreement (or to another Successful Bidder arising from the Auction, if any).[10]

34.    The Debtor further submits that notice of this Motion and the related hearing to consider entry of the **Bidding Procedures** Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with the applicable requirements of Bankruptcy Rule 2002. The Debtor proposes that no other or further notice of the Sale shall be required. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

## C.    Summary of the Assumption Procedures.

35.    The Debtor also seeks approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "Assumption Procedures"). Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures (a) outline the process by which the Debtor will serve notice to all Contract Counterparties regarding the

---

[10] Pursuant to the Bidding Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Stalking-Horse Bidder pursuant to the Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto, and the right, procedures, and deadlines for objecting thereto, will be provided in separate notices, attached to the Bidding Procedures Order as Exhibit 5 (the "Contract Notice") and Exhibit 6 (the "Assumption Notice") to be sent to the applicable Contract Counterparties.

proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

### Basis for Relief

**A.    The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved.**

36.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper); In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656-7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

37.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to

obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

38.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g., Integrated Resources,* 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

39.    The Debtor believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Assets. The proposed Bidding Procedures will allow the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best proposal for the Assets and who can demonstrate the ability to close a transaction. Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.    At the same time, the Bidding Procedures provide the Debtor with an opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale. Entering into the Purchase Agreement with the Stalking-Horse Bidder ensures that the Debtor will obtain fair market value for the Assets by setting a minimum purchase price for the Assets after an extensive pre-petition marketing effort by the Debtor and TenOaks that will be

tested in the marketplace.    As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above market.

41.    The Debtor submits that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this District.  *See In re Quicksilver Res., Inc.,* No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re Source Home Entm't, LLC,* No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014); *In re Palm Harbor Homes, Inc.,* No. 10-13850 (Bankr. D. Del. Jan. 6, 2011); *In re Ultimate Escapes Holdings, LLC,* No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); *In re PTC Alliance Corp.,* No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); *In re Hayes Lemmerz Intl, Inc.,* No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); *In re VeraSun Energy Corp.,* No. 08-12606 (Bankr. D. Del. Feb. 19, 2009).[11]

**B.    The Bid Protections Have a Sound Business Purpose and Should Be Approved.**

42.    The Debtor also seeks authority to offer customary bid protections.  The Debtor has agreed to pay the Break-Up Fee and Expense Reimbursement to the Stalking-Horse Bidder as an allowed administrative-expense priority claim (collectively, the "Bid Protections") if the Stalking Horse Bidder is not the Successful Bidder and the Debtor closes the sale of its assets to another bidder.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in Chapter 11 cases, as the use of a stalking-horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC,* 2011 WL 2671254, No.

---

[11] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtor's proposed counsel.

11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking-horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

43.    Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659-60 (emphasis added).  Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660-61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").  As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

44.     The Debtor believes that the allowance of the Bid Protections is in the best interests of the Debtor's estate and its creditors, as the Stalking-Horse Bid will establish a floor for further bidding that may increase the consideration given for the Assets. Here, the Bid Protections are a critical component of the Stalking-Horse Bidder's commitment. The Stalking-Horse Bidder has expended time and resources negotiating, drafting, and performing due diligence activities, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The parties negotiated the requested Break-Up Fee in good faith and at arm's-length with significant give-and-take with respect to proposed Bid Protections. As a result, by agreeing to the Bid Protections, the Debtor ensured that its estate would have the benefit of the transactions with the Stalking-Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

45.     If the Court does not approve the Bid Protections, the Stalking-Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtor's estate. Further, if the Bid Protections were to be paid, it will likely be because the Debtor received higher or otherwise superior offers for the Assets. In short, the proposed Bid Protections are fair and reasonable under the circumstances because the Break-Up Fee constitutes a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 *(quoting 995 Fifth Ave.*, 96 B.R. at 28). Accordingly, the Bid Protections should be approved.

**C.     The Form and Manner of the Sale Notice, Hard Consent Rights Notice, and Preferential Purchase Rights Notice Should Be Approved.**

46.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must

include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

47.    As noted above, within three (3) business days of entry of the Bidding Procedures Order, Debtor will serve the Sale Notice upon the following parties or their respective counsel, if known: (a) the U.S. Trustee; (b) counsel to the creditors' committee, if any; (c) counsel to the Stalking-Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets, and their respective counsel, if known, including the Pre-Petition Lender's counsel; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtor's other creditors; (j) each member of the Royalty Claimants Class; (k) counsel for the Royalty Claimants Class; (l) the United States Bureau of Land Management; (m) each governmental agency that is an interested party with respect to the Sale and the transactions proposed thereunder; and (n) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. In addition, the Debtor will also publish an abbreviated version of the Sale Notice in *The USA Today (National Edition), The Denver Post, The Wray Gazette,* and *The DailyDAC,* at least ten (10) days prior to the Auction.

48.    Within three (3) business days of entry of the Bidding Procedures Order, the Debtor will serve the Hard Consent Rights Notice and Preferential Purchase Rights Notice on the holders of Hard Consent rights and Preferential Purchase Rights, respectively.

49.    The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, the Hard Consent Rights Notice, the Preferential Purchase Rights Notice, the Contract Notice, and the Assumption

Notice as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

**D.      The Assumption Procedures Are Appropriate and Should Be Approved.**

50.      As set forth above, the Sale contemplates the assumption and assignment of the Contracts to the Stalking-Horse Bidder or Successful Bidder at the Auction, if any.  In connection with this process, Debtor believes it is necessary to establish a process by which (a) the Debtor and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts (the "Assumption Procedures").

51.      As set forth in the Bidding Procedures Order, the Debtor also requests that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Contract Notice. *See, e.g., In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *In re Gabel*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

52.      The Debtor believes that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtor requests the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

**E.      The Sale Should Be Approved as an Exercise of Sound Business Judgment.**

53.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin,* 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper,* 933 F.2d at 515 (same); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc'ns, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

54.     Once the Debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.,* 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC,* 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate"); *Integrated Res.,* 147 B.R. at 656; *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

**F.      A Sound Business Purpose Exists for the Sale.**

55.     As set forth above, the Debtor has a sound business justification for selling the Assets. *First,* the Debtor believes the Sale will maximize the Assets' going-concern value by allowing a party to bid on the Debtor's Assets in a free-and-clear sale structure which enables the Debtor to maximize the value of the Assets for the estate. Moreover, because the Purchase Agreement contemplates the assumption of certain of the Debtor's Contracts, it will result in payment in full for a number of creditors of the Debtor's estate.

56.     *Second,* the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets. Consequently, the

ultimately successful bid, having undergone a "market check" in the form of the Auction, will constitute, in the Debtor's reasonable business judgment, the highest or otherwise best offer for the Assets and will likely provide a greater recovery for its estate than any available alternative. *See, e.g., In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction").

57.    Thus, the Debtor submits that the Successful Bidder's Purchase Agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other alternative.  As such, the Debtor's determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Debtor's business judgment.  The Debtor will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtor's business judgment.

**G.    Adequate and Reasonable Notice of the Sale Will Be Provided.**

58.    As described above, the Sale Notice (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

**H.**    **The Sale and Purchase Price Reflects a Fair Value Transaction.**

59.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Say. Ass'n. v. 203 N LaSalle St. P'ship,* 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.,* 2001 WL at *4 (while a "section 363(b)sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arms'-length fair value transaction").

60.    **Even as the Debtor** moves forward with the Sale, TenOaks will continue to market the Assets **and solicit** other offers consistent with the Bidding Procedures, including, for example, by contacting **previously** solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtor with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized; alternatively, if no Auction is held because no Auction is necessary, the Purchase Agreement's purchase price will, conclusively, be fair value.

**I.**    **The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking-Horse Bidder or Successful Bidder Will be a "Good-Faith Purchaser."**

61.    The Debtor requests that the Court find that the Stalking-Horse Bidder or other Successful Bidder at the Auction, if any, is entitled to the protections provided by section 363(m)of the Bankruptcy Code in connection with the Sale of the Assets.

62.    Section 363(m)of the Bankruptcy Code provides in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith,

> whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

63.    Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1989) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

64.    The Debtor submits that the Stalking-Horse Bidder, or any other Successful Bidder at the Auction, will be a "good faith purchaser" within the meaning of section 363(m), and that the Purchase Agreement, or any modified, approved versions thereof, are or will be good-faith agreements on arms'-length terms entitled to the protections of section 363(m).[12] ***First,*** the consideration to be received by the Debtor pursuant to the Purchase Agreement is substantial, fair,

---

[12] The Debtor believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder at the Auction. Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures. In addition, the Debtor will not choose as the Successful Bidder or Backup Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code it reasonably doubts, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m)of the Bankruptcy Code has been satisfied.

and reasonable. *Second,* the parties entered into the Purchase Agreement in good faith and after extensive, arms'-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arms'-length, good-faith basis. *Third,* there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. *Finally,* the Stalking-Horse Bidder's offer was evaluated and approved by the Debtor in consultation with its advisors, and any other bids that the Debtor ultimately determines to be a Successful Bid will have been evaluated in a similar fashion. Accordingly, the Debtor believes that the Stalking-Horse Bidder (or other Successful Bidder arising from the Auction, if any) and the Purchase Agreement (or approved modified version thereof) will be entitled to the protections of section 363(m) of the Bankruptcy Code.

**J.    The Sale Should be Approved "Free and Clear" Under Section 363(f).**

65.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

66.    Satisfaction of any of the five requirements enumerated in Section 363(f) suffices to authorize the Debtor's sale of the Assets free and clear of all interests (*i.e.,* all liens, claims,

rights, interests, charges, or encumbrances). *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

67.     Here, the Pre-Petition Lender for the Secured Creditor holding valid and perfected first-priority liens against the Assets, has either consented, or will have consented, to the Sale, or exercised its credit-bid right and is the Successful Bidder. The Debtor submits that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five requirements of section 363(f), and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale with the same priority, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority to convey the Assets to the Stalking-Horse Bidder or other Successful Bidder at the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**K.**     **Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

68.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim, and does not limit the credit bid to the claim's economic value. *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60

(3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

69.     In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See In re Source Home Entm't, LLC,* No. 14-11553 (KG) (Bankr. D. Del. July 21, 2014) (order approving bid procedures which authorized parties with secured claims to credit bid); *In re Fisker Auto. Holdings, Inc.,* No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (order authorizing secured creditors to exercise right under Bankruptcy Code section 363(k) to make a credit bid); *In re PTC Alliance Corp.,* No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); *In re Hayes Lemmerz Intl, Inc.,* No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing any interested party to exercise its right under section 363(k) to make a credit bid); *In re Foamex Int'l Inc.,* No. 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); *see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),* 432 F.3d 448, 459-60 (3d Cir. 2006) (citation omitted).

70.     If the Pre-Petition Lender elects, it (or its designated representative), is entitled to credit bid some or all of the claims secured by its collateral pursuant to section 363(k) of the Bankruptcy Code. For the avoidance of doubt, the Purchase Agreement contemplates that the Pre-Petition Lender is entitled to credit bid up to the face value of its secured claims.

**L.**     **The Assumption and Assignment of the Contracts Should Be Approved.**

**a)**     **The Assumption and Assignment of the Contracts Reflects the Debtor's Reasonable Business Judgment.**

71.     The Debtor seeks authority to assign or transfer the Assigned Contracts to the Stalking-Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

72.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365(b).  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

73.     Here, the Court should approve the decision to assume and assign the Assigned Contracts as a sound exercise of the Debtor's business judgment:  *First,* the Assigned Contracts

are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. *Second,* it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction. *Third,* the Purchase Agreement provides that the assumption and assignment of the Assigned Contracts is integral to, and inextricably integrated in, the Sale. *Finally,* the Assigned Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in this Chapter 11 Case.

74.    **Accordingly,** the Debtor submits that the assumption and assignment of the Contracts by way of the Assumption Procedures should be approved as an exercise of its business judgment.[13]

**b)    Defaults Under the Assigned Contracts Will Be Cured Through the Sale.**

75.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically, that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-

---

[13] Under Colorado law, and the law of most western states, a lessee's interest in an oil and gas lease (such as a Working Interest) is considered "an interest in real estate." *Hagood v Heckers*, 513 P.2d 208, 214 (Colo. 1973). Thus, oil and gas leases, including the Transferred Leases and Interests as such terms are defined in the Purchase Agreement, are not unexpired leases or executory contracts under section 365. *See In re Topco*, 894 F.2d 727, 740 n.17 (5th Cir. 1990) ("oil and gas leases considered to be freehold estates by the governing state law do not constitute 'unexpired leases' under the Bankruptcy Code and therefore Section 365 does not govern their assumption or rejection").

debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

76.     The Debtor submits that the statutory requirements of section 365(b)(1)(A) will be satisfied because the Purchase Agreement requires that the Stalking-Horse Bidder cure all defaults that exist under the contracts that are to be assumed.  Because the Bidding Procedures Order provides a clear process by which to resolve disputes over cure amounts or other defaults, if defaults exist that must be cured, the cure will be achieved fairly and efficiently.

c)     **Non-Debtor Parties Will Be Adequately Assured of Future Performance.**

77.     Similarly, the Debtor submits that the third requirement of section 365(b)— adequate assurance of future performance—will be satisfied here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

78.     The Debtor submits that it can demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Stalking-Horse Bidder (or other Successful Bidder at the Auction, if any) will be satisfied.  As required by the Bidding Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party as a Qualified

Bidder (*e.g.,* financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Stalking-Horse Bidder or any Successful Bidder arising from the Auction.  Further, the Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking-Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtor to assume and assign the Assigned Contracts as set forth in the Purchase Agreement.

**M.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

79.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."    Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."    The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

80.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise," the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and

overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

81.    To maximize the value received for the Assets, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Notice

82.    The Debtor will provide notice of this Motion to:  (a) the U.S. Trustee; (b) co-counsel for the Committee, if any; (c) the administrative agent under the Debtor's prepetition credit facility; (d) counsel to Wells Fargo; (e) the United States Attorney's Office for the District of Delaware; (f) the Internal Revenue Service; (g) the Environmental Protection Agency; (h) the office of the attorneys general for the states in which the Debtor operate; (i) the Securities and Exchange Commission; (j) the United States Bureau of Land Management; (k) the Colorado State Land Board, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

83.    No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter the Bidding Procedures Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Date:   March 16, 2018
        Wilmington, Delaware

SULLIVAN • HAZELTINE • ALLINSON LLC

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
901 North Street, Suite 1300
Wilmington, DE 19801
Telephone: (302) 428-8191
Facsimile: (302) 428-8195
Email:  bsullivan@sha-llc.com
        whazeltine@sha-llc.com

-and-

DAVIS GRAHAM & STUBBS LLP
Christopher L. Richardson, Colo. No. 13437
Thomas C. Bell, Colo. No. 17717
Kyler K. Burgi, Colo. No. 46479
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email:  chris.richardson@dgslaw.com
        tom.bell@dgslaw.com
        kyler.burgi@dgslaw.com

*Proposed Attorneys for the Debtor and Debtor-in-Possession*